UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

KILN UNDERWRITING LIMITED                     CIVIL ACTION

VERSUS                                        NO: 06-4350

JESUIT HIGH SCHOOL OF NEW                     SECTION: R (4)
ORLEANS

**ORDER AND REASONS**

    Before the Court are Jesuit High School's motions for
partial summary judgment on the issue of extra expense coverage
(R. Doc. 187) and on the issue of business interruption coverage
(R. Doc. 183).  Also before the Court is Kiln Underwriting's
motion to review a magistrate's order (R. Doc. 289).  For the
following reasons, the Court GRANTS in part and DENIES in part
Jesuit's Motion for Summary Judgment on the Issue of Extra
Expense Coverage.  Further, the Court DENIES Jesuit's Motion for
Summary Judgment on the Issue of Business Interruption Coverage.
Finally, the Court GRANTS Kiln's motion to review the
magistrate's order.

I.    **BACKGROUND**

Kiln Underwriting Limited, individually and as the authorized representative of certain underwriters and insurers at Lloyd's of London, issued an insurance policy to Jesuit that provided coverage from November 1, 2004 through November 1, 2005. On February 23, 2006, Father Anthony McGinn, President of Jesuit High School, submitted a partial proof of claim to its insurance agent detailing the property damage sustained by Jesuit as a result of Hurricane Katrina.  Father McGinn supplemented the proof of claim in December of 2007.

On August 16, 2006, Kiln filed a complaint in federal court seeking a declaratory judgment on the rights and obligations of Kiln and Jesuit under the insurance policy.  Jesuit answered the complaint on October 13, 2006, and filed a counterclaim seeking payment under the policy, as well as penalties pursuant to Louisiana Revised Statutes §§ 22:658 and 22:1220.  Jesuit had also filed a separate complaint against Kiln in August of 2006, which the Court consolidated with the declaratory judgment action. (Civ. No. 06-5060.)  The Court consolidated with these actions a third lawsuit in which Jesuit had sued its insurance brokers, Waldorf Risk Solutions, LLC and Waldorf & Associates, Inc. (Civ. No. 06-5057).  Jesuit settled with the Waldorf parties, and they were dismissed on July 28, 2008.

Jesuit filed two motions for partial summary judgment, one

2

dealing with extra expense coverage, and the other with business interruption coverage.  In addition, Kiln filed a motion to review an order of the magistrate judge denying Kiln leave to amend its complaint.  The Court now rules as follows.


## II.  LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at

325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts
to the nonmoving party, who must, by submitting or referring to
evidence, set out specific facts showing that a genuine issue
exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not
rest upon the pleadings, but must identify specific facts that
establish a genuine issue exists for trial.  *See id.* at 325;
*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

**B.   Contract Interpretation**

Because jurisdiction is based on diversity of citizenship,
Louisiana law applies to the substantive issues before the Court.
*Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Under
Louisiana law, an insurance policy, like other contracts, is the
law between the parties.  *Pareti v. Sentry Indem. Co.*, 536 So.2d
417, 420 (La. 1988).  If the policy wording is clear, and it
expresses the intent of the parties, the agreement must be
enforced as written. *Id.*  The policy must be construed as a
whole, and one portion should not be construed separately at the
expense of disregarding another.  *Id.*  If an ambiguity exists,
the ambiguity must be construed in favor of the party seeking
coverage.  *Id.*  The Court may not alter the terms of the policy
under the guise of contract interpretation when the language of
the policy is unambiguous. *Id.*

4

## C.    Review of Magistrate's Order

A magistrate judge may hear and determine many pretrial matters pending before a district court.  *See* 28 U.S.C. § 636(b)(1).  When a magistrate decides a nondispositive matter, the district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).  Under this standard, factual findings are reviewed for clear error, which is present when "the reviewing court upon examination of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Bolding v. Commissioner of Internal Revenue*, 117 F.3d 270, 273 (5th Cir. 1997).  Conclusions of law should be overturned when the magistrate "fails to apply or misapplies relevant statutes, case law or rules of procedure." *Carmona v. Wright*, 233 F.R.D. 270, 276 (N.D.N.Y. 2006); *see also Doe v. Hartford Life and Acc. Ins. Co.*, 237 F.R.D. 545, 548 (D.N.J. 2006) ("[A] magistrate judge's legal conclusions on a non-dispositive motion will be reviewed de novo").  For issues that are committed by law to a judge's discretion, such as the resolution of discovery disputes, the magistrate's rulings are reviewed for abuse of discretion.  *See Doe*, 237 F.R.D. at 548 ("In matters where the magistrate judge is authorized to exercise his or her discretion, the decision will be reversed only for an abuse of discretion."); *Commodity Futures Trading Com'n v.*

5

*Standard Forex, Inc.*, 882 F. Supp. 40, 42 (E.D.N.Y. 1995).

**III. DISCUSSION**

    **A.    Extra Expense Coverage**

    Jesuit moves to recover Extra Expenses that it contends are due under the insurance policy.  Jesuit further moves for bad faith penalties because Kiln has not paid for the Extra Expenses, as provided for by the policy.  The Policy provides in Section A, Coverage Part III as follows:

> This Coverage Part insures the necessary Extra Expense, as hereinafter defined, incurred by the Assured in order to continue as nearly as practicable the normal operation of the Assured's business following direct physical loss or damage by any of the perils insured against by this Section to property insured by this Section occurring during the period of insurance.
>
> ....
>
> Extra Expense is defined as "the excess (if any) of the total cost necessarily and reasonably incurred during the Period of Restoration chargeable to the operation of the Assured's business, over and above the total cost that would normally have been incurred to conduct the Assured's business during the same period had no loss or damage occurred.

(Lloyd's Policy, R. Doc. 228-5, at 23.)[1]

    In denying coverage, Kiln argues that Jesuit has not shown that the extra expenses were incurred in consequence of "direct physical loss or damage by any of the perils insured against by

--------

    [1] All pages numbers are references to page numbers in the original policy.

this Section . . . ." (Lloyd's Policy at 23.)  It is uncontested that on August 29 and 30, 2005, Jesuit High School suffered wind and rain damage, as well as damage caused by "water intrusion." Though there is a dispute about the nature of the water damage-- Kiln labels it flood damage whereas Jesuit maintains that it was caused by backed up drains or sewers--the dispute is immaterial to the issue at hand.  Windstorm, flooding, and backed up drainage systems are all "perils insured against" by Section A of the policy. (*See* Lloyd's Policy at 7-8.)  Though the policy limits recovery for flood damage to $250,000 per year (*see* R. Doc. 228-5 at 3), flooding is nevertheless a covered peril.  In addition, there is no issue of fact as to whether the covered damage caused Jesuit to find alternative locations in which to teach its students before it could re-open its main building.

Jesuit contends that it incurred two different types of additional expenses.  First, Jesuit says that it paid $34,551.55 to rent facilities from St. Martin's Episcopal School in order to provide classes for about six hundred students during October and November of 2005.  Second, Jesuit claims that it incurred $203,434.00 in extra expenses while it used Strake Jesuit of Houston's facilities to provide classes for students who had temporarily relocated to Houston.

i.  *St. Martin's Expenses*

The Court finds that the St. Martin's rental payments are Extra Expenses covered by the policy.  Jesuit has submitted copies of rental invoices from St. Martin's in the amount of $17,566.27 for October and $16,985.28 for November.  (*See* R. Doc. 187-3.)  It has also submitted the canceled checks corresponding to the payments on those invoices.  (*See id.*)  An accountant that Kiln retained to review Jesuit's claim confirmed the assessment: "In my opinion Jesuit High School of New Orleans sustained extra expenses of $34,552."  (R. Doc. 187-6 at 4.)  Kiln argues that Jesuit has "failed to prove the requisite causation between a covered peril and any necessary extra expense."  (R. Doc. 259 at 1.)  But Kiln has already compensated Jesuit for windstorm damage and some flood damage.  Absent some indication of fraud, it is reasonable to infer that this damage forced Jesuit to move its operations to St. Martin's for two months.  The Court therefore finds that Jesuit incurred $34,551.55 in covered Extra Expenses for the rent payments to St. Martin's.

Kiln has introduced evidence that Jesuit applied to the Federal Emergency Management Agency (FEMA) for a Public Assistance Grant for the specific purpose of covering the St. Martin's rental expenses.  (*See* R. Doc. 228-8.)  Drawing on cases holding that an insured with more than one type of coverage may not recover an amount greater than his total loss, *see, e.g.,*

*Gaffney v. State Farm Fire and Cas. Co.*, 2008 WL 941717 at *3
(E.D. La. 2008); *Naccari v. State Farm Fire & Cas. Co.*, 2007 WL
4374226 at *2 (E.D. La. 2007), Kiln argues that its liability for
the St. Martin's expenses should be offset by the amount of any
FEMA funding that Jesuit has received.  As Kiln puts it, Jesuit
is not entitled to a "windfall double recovery."  (R. Doc. 228 at
17.)  *Cf. Cole v. Celotex Corp.*, 599 So.2d 1058, 1080 (La. 1992)
("As a general rule the claimant may recover under all available
coverages provided that there is no double recovery.") (quoting
15A COUCH ON INSURANCE § 56:34 (2d ed. 1983)).  Jesuit, in turn,
argues that the FEMA grant should not be counted because the
money must be repaid to the government.

     Jesuit is correct that federal law already limits the
duplication of federal disaster benefits.  FEMA assistance is
"intended to supplement assistance from other sources," not to
serve as a primary source of insurance.  FEMA, Disaster
Assistance Policy 9525.3 (July 24, 2007);[2] *see also State of
Hawaii v. Federal Emergency Management Agency*, 294 F.3d 1152,
1162 (9th Cir. 2002) (finding that Congress intended for FEMA "to
provide disaster assistance only when insurance proceeds to which
a person is entitled have been considered and the need for
supplemental assistance remains") (quoting S.Rep. No. 100-524 at

---

     [2] *Available at* http://www.fema.gov/government/
grant/pa/9525_3.shtm.

13 (1988)).   The Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act") directs the President to ensure that no entity "will receive such assistance with respect to any part of such loss as to which he has received financial assistance under any other program or from insurance or any other source."   52 U.S.C. § 5155(a).   Pursuant to this authority, FEMA does not provide assistance for damages covered by insurance and de-obligates funds if it discovers that the damage is covered by insurance.   *See* FEMA, Disaster Assistance Policy 9525.3; FEMA, Disaster Assistance Fact Sheet Number 9580.3 (May 29, 2008).[3]

Furthermore, FEMA is permitted to recover duplicative funds from a grant recipient in the manner that it would recover from a debtor.   *See* 42 U.S.C. § 5155(c).   As interpreted by the only federal court of appeals to consider the issue, this permits FEMA to collect not only insurance benefits that were actually transferred to the grant recipient, but also "any additional benefits that [the recipient] would have received had [it] acted in a commercially reasonable manner."   *State of Hawaii*, 294 F.3d at 1165.   FEMA may thus recover the value of insurance coverage reasonably available to the grant recipient, even if the recipient never collected the benefits.

The Court finds that the Jesuit's receipt of FEMA funding,

---

[3] *Available at* http://www.fema.gov/government/grant/pa/9580_3.shtm.

if any, has no bearing on Jesuit's ability to recover from Kiln. The Stafford Act provisions discussed above minimize the possibility that Jesuit will recover twice for the same loss. FEMA does not obligate funds for damage already covered by insurance, and it has the power to recover funds already granted. Indeed, providing Kiln with an offset might leave Jesuit worse off than it was to begin with, since FEMA may recover the entire grant amount *and* any excess amount that Jesuit "would have received [from Kiln] had [Jesuit] acted in a commercially reasonable manner." *State of Hawaii*, 294 F.3d at 1165.  To avoid this result, this Court declines to offset an otherwise valid insurance claim by the amount of any FEMA assistance.

A rule against using FEMA funds to offset an insurance recovery also serves the purposes of the federal Stafford Act. As the Ninth Circuit noted, the provision enabling FEMA to recover duplicative benefits was intended to prevent covered parties and insurers from failing to seek or provide coverage as they ordinarily would, that is, to prevent them from treating the federal government as a primary insurer.  *See id.* at 1163.  The idea of federal disaster relief programs is to provide a "safety net," *id.*, not to relieve individuals and entities of the incentive to hedge against risk.  The insurer thus bears the primary responsibility for any covered loss.  To the extent that double recovery is a problem, the Stafford Act assigns FEMA the

11

authority to deny or recover duplicative benefits.  Whether FEMA chooses to do so in any given case is not a matter of concern for the insurer.

For these reasons, the Court grants Jesuit's motion for summary judgment with respect to the St. Martin's expenses.


ii.  *Strake Expenses*

With respect to the alleged Strake expenses, the Court finds that Jesuit has not met its burden of proof.  Jesuit does not provide any evidence that *it* incurred the claimed $203,434.00 in Extra Expenses; rather, it submits evidence that *Strake* spent that amount to provide classroom space for Jesuit's students. (*See, e.g.*, R. Doc. 187-6 at 27 (letter from Jesuit's Director of Finance noting that Strake "has advised that these [relocation] costs were covered by Strake from a special fund they had established").)  The Court finds that the Strake expenses were never "incurred by the Assured," so as to implicate coverage under the policy.  Insurance contracts are contracts of indemnity, and an insured can only recover up to the amount of his or her loss.  *See, e.g., Weiss v. Allstate Ins. Co.*, 2007 WL 891869 (E.D. La. 2007).  Jesuit has put forth no evidence that it sustained any losses in connection with using Strake Jesuit of Houston's facilities, and its motion for partial summary judgment must be denied in this respect.

*iii. Bad Faith Penalties*

In addition to demanding payment for the covered losses themselves, Jesuit contends that Kiln has acted in bad faith in failing to pay the Extra Expense claim, and that Jesuit is therefore entitled to penalties pursuant to LA. REV. STAT. § 22:658.  Louisiana law imposes penalties on insurers who arbitrarily or capriciously fail to pay a claim.  *See* LA. REV. STAT. §§ 22:658, 22:1220(b)(5).[4]  In order to recover the statutory penalties, a claimant must show that (1) the insurer received a satisfactory proof of loss; (2) the insurer failed to pay the claim within the applicable statutory period; and (3) the insurer's failure to pay was arbitrary, capricious, or without probable cause.  *Meadowcrest Living Center L.L.C. v. Hanover Ins. Co.*, 2008 WL 2959707 (E.D. La. 2008).

The first element requires the claimant to demonstrate that the insurer received a "satisfactory proof of loss."  As the Louisiana Supreme Court has interpreted the phrase, "[a]

---

[4] The Louisiana Supreme Court has noted that both statutes incorporate the same standard:

> The conduct prohibited in R.S. 22:658(A)(1) is virtually identical to the conduct prohibited in R.S. 22:1220(B)(5): the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause. The primary difference is the time periods allowed for payment.

*Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So. 2d 1012, 1020 (La. 2003).  The cases interpreting the two provisions are thus used interchangeably.

'satisfactory proof of loss' . . . is that which is sufficient to fully apprise the insurer of the insured's claim." *Hart v. Allstate Insurance Company*, 437 So. 2d 823, 828 (La. 1983).  The proof "is not required to be in any formal style," *Nguyen v. St. Paul Travelers Ins. Co.*, 2007 WL 1672504, at *4 (E.D. La. 2007) (citing *Sevier v. U.S. Fidelity & Guar. Co.*, 497 So.2d 1380 (La. 1986)), so long as the insurer receives sufficient facts to fully apprise him of the nature, basis, and extent of the insured's claim.  *See McDill v. Utica Mut. Ins. Co.*, 475 So. 2d 1085, 1089 (La. 1985).  Importantly, the insured need not establish the precise amount of the loss; so long as he has "made a showing that the insurer will be liable for some general damages," the satisfactory proof of loss requirement is satisfied.  *Id.* at 1091; *see also id.* ("To accept the defendant's position that no amount must be tendered unless the exact extent of general damages is proven . . . places an impossible burden on the plaintiff prior to going to trial.").  Finally, because the proof of loss requirement turns on the state of the insurer's knowledge rather than the affirmative acts of the insured, receipt of an independent adjuster's report may constitute a satisfactory proof of loss.  *See Becknel v. Lafayette Ins. Co.*, 773 So. 2d 247 (La. App. 2000), *writ denied*, 785 So. 2d 827; *Carter v. Safeway Ins. Co.*, 859 So. 2d 279 (La. App. 2003).

There is no question that Kiln received satisfactory proof

14

of the St. Martin's expenses.  Jesuit's initial partial proof of

loss described the relocation expenses and included an attachment

breaking down the estimated rent payments by month.  (*See* R. Doc.

187-4 at 5, 8.)  Jesuit's supplemental proof of claim, submitted

on December 13, 2007, further described the St. Martin's expenses

and included the copies of Jesuit's checks to St. Martin's as an

attachment.  (*See* R. Doc. 187-5 at 7.)  Finally, a report

prepared at Kiln's request and dated January 9, 2008, indicated

that "Jesuit High School of New Orleans sustained extra expenses

of $34,552."  (R. Doc. 187-6 at 4.)  There has never even been a

dispute about the amount of the St. Martin's expenses, let alone

the fact of their existence.

        In response, Kiln argues that Jesuit's partial proof of loss

was unsatisfactory because it did not comply with a provision in

the policy requiring all submitted proofs of loss to be sworn.

This argument misunderstands the statutory requirement.  As the

Louisiana courts have interpreted the proof of loss provision, an

insurer need only be "fully apprise[d]" of the insured's claim.

As this standard was designed to be flexible, it does not

incorporate the more exacting proof of loss requirements of the

underlying insurance policy.  To the extent that an insured's

failure to comply with a "proof of loss" clause is relevant at

all, it is to the question of arbitrary or capricious behavior.

That is, if the noncompliance gives the insurer a reason to

believe that the claim can be denied, its failure to pay the insured's claim within the statutory period may be excusable. *See infra*.

The second element requires the claimant to show that the insurer failed to pay the claim within the applicable statutory period. It is clear from the record that Kiln still has not paid Jesuit's extra expense claim. As more than ten months have passed since Jesuit submitted its supplemental proof of claim, and more than nine months have passed since Kiln received the report confirming the extra expenses, the Court finds that Kiln failed to pay the extra expense claim within the statutory period.

The final element requires the claimant to demonstrate that the insurer's failure to pay was arbitrary, capricious, or without probable cause. The inquiry, which is based upon "the facts known to the insurer at the time of its action," asks whether the insurer "has a reasonable basis to defend the claim and acts in good-faith reliance on that defense." *Reed*, 857 So.2d at 1021. Because Louisiana law requires insurers who dispute the extent of the loss to "tender the reasonable amount which is due," that is, "a figure over which reasonable minds could not differ," *McDill*, 475 So. 2d at 1091-92, an insurer who fails to tender any amount within the statutory period must rely on a reasonable defense that would preclude all recovery.

16

Finally, while arbitrariness is a question of fact that is generally best left for the jury to decide, *see, e.g.*, *Coig v. Gregoire*, 2008 WL 144248 (La. App. 2008), judges can decide the issue on summary judgment if "there is shown to be no genuine issue of material fact as to the vexatiousness of the parties' actions." *Baker v. Dearie*, 2006 WL 1968902 at *2 n.7 (E.D. La. 2006); *cf. Guillory v. Domtar Undus., Inc. v. John Deere Co.*, 95 F.3d 1320, 1326 (5th Cir. 1996) ("Though summary judgment is rarely proper when an issue of intent is involved, the presence of an intent issue does not automatically preclude summary judgment; the case must be evaluated like any other to determine whether a genuine issue of material fact exists.").

Jesuit has shown that despite Kiln's receipt of uncontroverted evidence that Jesuit sustained extra expenses, Kiln failed to make a so-called McDill tender. *See Wambsgans v. Liberty Lloyds Ins. Co.*, 595 So.2d 719, 721 (La. App. 1992). Though Kiln argues that the extra expense claim was "a disputed claim from its inception" (R. Doc. 228-1 at 1), the Court can conceive of no good-faith basis for the belief that the claim could be denied in its entirety. Jesuit's supposed intransigence does not justify Kiln's behavior. Failure to strictly comply with contractual proof of loss provisions "can void coverage only if the insurer proves that it was actually prejudiced by the lapse." *Federal Deposit Ins. Corp. v. Aetna Cas. and Sur. Co.*,

17

744 F. Supp. 729, 734 (E.D. La. 1990) (citing *Jackson v. State Farm Mutual Automobile Insurance Co.*, 29 So.2d 177 (La. 1947)). The facts before the Court do not suggest that the unsworn nature of the proof of loss caused any prejudice at all, let alone the sort of prejudice that would justify denying the claim in its entirety. *Compare Elevating Boats, Inc. v. Gulf Coast Marine, Inc.*, 766 F.2d 195 (5th Cir. 1985) (holding that the insured was not entitled to coverage under a defense clause because its failure to notify the insurer of the accident until two weeks before trial caused "substantial prejudice").

Finally, while Kiln correctly notes that, in extreme cases, an insured's failure to comply with discovery rules or a cooperation clause may void coverage, *see, e.g.*, *Lee v. United Fire & Cas. Co.*, 607 So.2d 685 (La. App. 1992), this is not an extreme case. *Compare Lee*, 607 So. 2d at 685-86 (detailing the insureds' "protracted failure . . . to comply with policy provisions and discovery rules requiring them to furnish information"). Indeed, Kiln has neither alleged that Jesuit disobeyed a discovery order, nor directed the Court's attention to a cooperation clause in either the general provisions of the policy or the provisions covering extra expenses. (*Compare* Lloyd's Policy at 62 (cooperation clause in section covering employee benefit liability).). Moreover, Kiln's suggestion that it reasonably relied on an expected FEMA offset in denying

coverage has no legal basis, and therefore could not excuse Kiln's nonperformance.  Because no conceivable defense to Jesuit's claim had a "reasonable basis," *Reed*, 857 So.2d at 1021, the Court finds that there is no genuine issue of material fact as to whether Kiln acted arbitrarily, capriciously, or without probable cause.  The Court therefore grants Jesuit's motion for partial summary judgment with respect to bad faith penalties for failure to pay the St. Martin's extra expenses.

### B.   Business Interruption Coverage

The parties also dispute whether the insurance policy includes business interruption coverage.  Jesuit's policy, like many insurance policies, has several distinct parts.  The coverage is divided into two main sections.  Section A covers loss to "[a]ll real and personal property" belonging to Jesuit. (Lloyd's Policy at 1.)  Section B covers other operations-related losses, such as losses due to personal injury and losses due to employee dishonesty. (*See* Lloyd's Policy at 39, 49.)  At the beginning of the policy is a Main Schedule listing the policy number, the name of the assured, the total sum insured, the premium, and so forth. (*See* Lloyd's Policy at 1-2.)  Preceding each of the two main coverage sections is a Declarations page, which lists the policy limits and sub-limits particular to that section. (*See* Lloyd's Policy at 5.)  Finally, there is a

19

separate "Schedule of Sub-Limits" for Section A, which lists additional sub-limits for various types of losses.  (*See* R. Doc. 228-5 at 3; *see also* Lloyd's Policy at 5 (clause incorporating "[a]ll other sub-limits as attached . . .").)

The business interruption dispute concerns the effect of this separate Schedule of Sub-limits.  Section A, Coverage Part II of the policy purports to "insure[] against loss resulting directly from necessary interruption of business . . . ." (Lloyd's Policy at 19.)  Yet the attached Schedule of Sub-limits for Section A lists the words "Not Included" next to "Business Interruption."  (R. Doc. 228-5 at 3.)  Kiln argues that this provision excludes business interruption coverage from the policy.  Jesuit argues that it merely indicates that there is no sub-limit for business interruption coverage and that Section A, Coverage Part II is therefore covered up to the full policy limit for Section A.

The Court finds that the insurance policy unambiguously excludes business interruption coverage.  As noted above, an insurance policy must be construed as a whole, and one portion should not be construed separately at the expense of disregarding another. *See Pareti*, 536 So.2d at 420.  Though Section A, Coverage Part II, seems to provide business interruption coverage, it must be read in conjunction with the Schedule of Sub-limits for Section A.  The Schedule of Sub-limits, which is

20

incorporated through the Section A Declarations (*see* Lloyd's Policy at 5), clearly provides that business interruption coverage is "Not Included."  These two provisions are not in conflict.  The Schedule of Sub-limits, which is tailored to Jesuit's actual coverage, is intended to supplement or otherwise modify the more general contract provisions.  Read together, the two portions of the policy evidence an intent to exclude business interruption coverage from the policy.

Other features of the Schedule of Sub-limits reinforce this interpretation.  A sentence at the bottom of the schedule provides: "The word 'Included' wherever used above shall be deemed to read 'Included up to the full Limit of Liability.'" (R. Doc. 228-5 at 3.)  One type of coverage, "Valuable Papers and Records," is marked "Included," indicating that it is included up to the full limit of liability.  Twelve other types of coverage, including rental income, watercraft, debris removal, and business interruption, are marked "Not Included."[5]  Jesuit's interpretation fails to account for the distinction between "Included" and "Not Included" in the Schedule of Sub-limits.  If the drafters had intended business interruption coverage to be

---

[5] Though some of these other types of "Not Included" coverage are described in the body of the agreement (*see* Lloyd's Policy at 25, 28, 29 (describing coverage for Rental Income/Value, Accounts Receivable, and Leasehold Interests)), Jesuit does not appear to claim that it is entitled to coverage under those provisions.

"Included up to the full Limit of Liability," they would have marked it as "Included."

Jesuit argues that it "defies reason" to think that an insurance policy would include four pages describing a particular type of coverage only to negate the coverage with two words on a supplemental document.  (R. Doc. 183-2 at 8.)  The Court does not find the policy's structure to be unusual.  The bulk of the policy appears to consist of standard forms provided by Jesuit's London broker, JLT.  (*See, e.g.*, Lloyd's Policy at 34 (indicating that the form number is 901JLT00079).)  The more particularized Declarations and Schedules, which, unlike the standard forms, name Jesuit as the assured, contain additions to and modifications of the standard forms.  It is not illogical for an insurer to draft its policies in this manner; it saves the insurer from having to re-create commonly used language for each new contract.  For these reasons the Court finds that the policy does not include coverage for business interruption expenses.[6]

Jesuit also argues that Kiln has judicially admitted that the policy includes business interruption coverage.  The Court addresses this issue in the following section.

---

[6] Because the Court finds that the policy unambiguously excludes business interruption coverage, it does not consider the extrinsic evidence submitted by the parties.  *See Hampton v. Hampton, Inc.*, 713 So.2d 1185, 1189 (La. App. 1998) ("[T]he use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement.").

###### C.    Review of Magistrate's Order

Kiln has filed a motion asking the Court to review an order of the magistrate judge denying Kiln leave to amend its complaint.  The circumstances underlying the motion to review relate to Jesuit's claim that Kiln judicially admitted that the policy contained business interruption coverage.  The Court will briefly discuss those circumstances before turning to the merits of the motion.

In its original complaint and first amended complaint, both of which were filed in August of 2006, Kiln stated that it "issued Jesuit a policy of institutional policy insurance, including business interruption coverage, with respect to the [covered premises]."  (R. Doc. 3 at ¶ 7; *see also* R. Doc. 1 at ¶ 7 (same).)  Kiln further alleged that the "institutional property insurance coverage, including business interruption coverage, is as delineated in the policy, subject to various definitions, conditions, limitations, exclusions and endorsements as set forth" in the policy.  (R. Doc. 3 at ¶ 8; *see also* R. Doc. 1 at ¶ 8 (same).)

Kiln's counsel received a copy of the policy on March 1, 2006, but apparently failed to notice the Schedule of Sub-Limits at the time.  (*See* R. Doc. 338 at 2 (claiming that Schedule of Sub-Limits had been inserted between pages 86 and 87.)  At some point thereafter, Kiln realized its oversight and, on February

11, 2008, filed an amended answer to Jesuit's counterclaim that specifically denied that the policy contained business interruption coverage.  On March 5, 2008, Kiln timely sought leave to amend its complaint under FED. R. CIV. P. 15(a) to delete the references to business interruption coverage.  The magistrate judge denied the request, and the matter is now on appeal to this Court.

This Court reviews the magistrate's order for abuse of discretion.  *See Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998); *Doe v. Hartford Life and Acc. Ins. Co.*, 237 F.R.D. 545, 548 (D.N.J. 2006).  Under FED. R. CIV. P. 15(a)(2), a court "should freely give leave [to amend a pleading] when justice so requires."  The Federal Rules "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Swierkiewicz v. Sorema*, 534 U.S. 506, 514 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957)).  For this reason, "[a]mendments should be liberally allowed."  *Halbert v. City of Sherman*, 33 F.3d 526, 529 (5th Cir. 1994).  Though "the decision to grant or deny leave is one left to the sound discretion of the district court," *id.*, this discretion "does not permit denial of a motion to amend unless there is a substantial reason to do so." *Leffall v. Dallas Independent School Dist.*, 28 F.3d 521, 524 (5th

Cir. 1994) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (Former 5th Cir. Nov. 1981)).  In determining whether leave should be granted, the court may consider factors such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Lozano v. Ocwen Federal Bank*, 489 F.3d 636 (5th Cir. 2007).

In this case, leave to amend should have been granted because few, if any, factors weigh against amendment.  As a preliminary matter, it is undisputed that Kiln timely filed its motion for leave to amend.  (*See* Scheduling Order, R. Doc. 161 at 2.)  The magistrate found that the period of twenty months between the filing of the complaint and Kiln's motion for leave to amend constituted "significant delay."  (R. Doc. 287 at 9.) Kiln avers, however, that through its counsel's mistake it did not learn of the Schedule of Sub-Limits until November 14, 2007, and was not certain that the Schedule was truly part of the policy until January 9, 2008.  (*See* R. Doc. 289-2 at 16; *see also* R. Doc. 338.)  Kiln then requested leave to amend its answer to Jesuit's counterclaims on February 11, 2008, and requested leave to amend its complaint on March 5, 2008.  Regardless of how the delay is measured, two to four months is far less significant

than twenty months.  More importantly, Jesuit has submitted no evidence that the delay was "undue" or arose out of bad faith or dilatory motive. *Foman*, 371 U.S. at 182.  It appears that Kiln's counsel simply overlooked the Schedule of Sub-Limits, which was buried in the middle of the original copy of the policy.  (*See* R. Doc. 338.)  Soon after the mistake became apparent, and within the time period allowed by the Court's Scheduling Order, Kiln moved to amend its pleadings.  Absent some indicia of bad faith or dilatory motive, the magistrate should have given Kiln the benefit of the doubt and granted leave to amend.

Similarly, there is no evidence that Kiln "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed." *Id*.  The complaint has been amended once already, but the amendment was made at the very beginning of the litigation, well before Kiln discovered the existence of the Schedule of Sub-Limits.  No further amendments to the complaint were sought between August 23, 2006, and March 5, 2008.  When Kiln sought leave to amend its answer to Jesuit's counterclaim on February 11, 2008, it specifically included provisions referencing the Schedule of Sub-Limits and denying business interruption coverage.  Thus, of two amendments to the pleadings, one denied business interruption coverage and the other did not because the relevant information had not yet been discovered.  Based on these undisputed facts, the Court fails to see how Kiln "repeated[ly]

26

fail[ed] to cure deficiencies by amendments previously allowed."

The magistrate also overstated the likely prejudice to Jesuit if amendment is allowed.  As the magistrate recognized, Jesuit has had a complete copy of the policy, including the Schedule of Sub-Limits, since October 2005.  (*See* R. Doc. 287 at 11.)  Kiln has also recently submitted minutes from an October 15, 2005, meeting of Jesuit's President's Advisory Council, wherein Fr. McGinn is reported to have admitted that "[t]here is no business interruption coverage."  (*See* R. Doc. 352-3 at 1.) It thus appears from the record that Jesuit has been on notice of the business interruption issue since the outset of the litigation.  To the extent that Jesuit relied on the supposed admissions in the complaint, it did so knowing that the admissions could be mistaken.  For these reasons, the Court finds that any prejudice to Jesuit caused by the amendment is not so unfair as to warrant denial of leave of amend.[7]

---

[7] The magistrate also found that Jesuit "may have forfeited potential claims against Waldorf & Associates" when the two parties settled in July of 2008.  (R. Doc. 287 at 13.)  Yet Jesuit was put on notice that Kiln intended to pursue its business interruption argument long before the settlement.  As noted, Kiln amended its answer to Jesuit's counterclaim to specifically deny business interruption coverage in February of 2008.  It then sought leave to make a parallel amendment to its complaint in March of 2008.  Finally, Kiln filed its memorandum in opposition to Jesuit's motion for summary judgment on June 17, 2008, wherein it described its position regarding business interruption coverage in great detail.  If Jesuit gave up any potentially meritorious claims when it settled with Waldorf, it was not because of any misconception about Kiln's position on business interruption coverage.

Finally, amendment would hardly be futile in this case.  If Jesuit's theory of judicial admissions is to be taken seriously, a $2 million coverage dispute might turn on whether Kiln is allowed to amend its pleadings.  The magistrate's order is therefore reversed, and Kiln's motion for leave to amend its complaint is granted.

Because the Court has permitted Kiln to amend its complaint, Jesuit's arguments regarding judicial admissions are now moot. "When a party has amended a pleading, allegations and statements in earlier pleadings are not considered judicial admissions." *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002); *see also Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859–60 (9th Cir. 1995), *cert. denied*, 516 U.S. 861 (1995) ("Where . . . the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight."); *see generally* 30B GRAHAM, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 7026 (Interim ed. 2006).  Because the alleged admissions have now been withdrawn, Kiln is no longer bound by them.

Even if amendment were disallowed, the statements in Kiln's complaint would not necessarily have the effect that Jesuit urges.  To qualify as a judicial admission, a statement must be "deliberate, clear, and unequivocal." *Heritage Bank v. Redcom Laboratories, Inc.*, 250 F.3d 319, 329 (5th Cir. 2001).  On their

faces, the two statements in the first amended complaint do not meet this standard. Though Kiln admitted that it "issued Jesuit a policy of institutional policy insurance, including business interruption coverage" (R. Doc. 3 at ¶ 7), it noted in the following paragraph that coverage was limited as outlined in the policy (*see* R. Doc. 3 at ¶ 8). In addition, Kiln has already amended its answer to specifically deny that the policy contained business interruption coverage. Taken together, and in light of the "definitions, conditions, limitations, [and] exclusions" (R. Doc. 3 at ¶ 8) set forth in the Schedule of Sub-Limits, these statements do not constitute a "deliberate, clear, and unequivocal" admission that the policy covers business interruption expenses. *Heritage Bank*, 250 F.3d 319 at 329.

Moreover, it is "well-established that trial judges are given broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases." *Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F. Supp. 2d 394, 406 (D.N.J. 2000); *see also Coral v. Gonse*, 330 F.2d 997, 998 n. 1 (4th Cir. 1964)("If the District Court, convinced that an honest mistake had been made, the original allegation was untrue and that justice required relief, it may, in its discretion, relieve the party of its otherwise binding consequence."). This is just such a case. Kiln's counsel has admitted that he mistakenly overlooked the Schedule of Sub-Limits when he first received a

copy of the policy and has apologized to the Court and to Jesuit for his oversight. (*See* R. Doc. 338 at 2-3.) Kiln has also submitted evidence showing that Jesuit has long been aware that the policy lacked business interruption coverage. (*See* R. Doc. 352.) Litigation is not a game of "gotcha," and the Court declines to decide a hotly contested coverage issue based on an honest mistake. The Court therefore finds that Kiln's denial of business interruption coverage is not barred by any supposed admissions in the now-amended complaint.

**IV.   CONCLUSION**

For the foregoing reasons, Jesuit's motion for partial summary judgment on the issue of Extra Expense Coverage is GRANTED with respect to the St. Martin's expenses and associated

30

bad faith penalties and DENIED with respect to the Strake expenses.  Further, Jesuit's motion for partial summary judgment on the issue of business interruption Coverage is DENIED. Finally, Kiln's motion to review the magistrate's order is GRANTED and IT IS ORDERED that Kiln's motion for leave to file a second amended complaint (R. Doc. 148) is GRANTED.


New Orleans, Louisiana, this 24th  day of October, 2008.


SARAH S. VANCE
UNITED STATES DISTRICT COURT